We have four argued cases this morning. The first is number 19-1172 Boehringer Ingelheim v. Mylan Pharmaceuticals Inc. Ms. Benetti. Good morning. May it please the court. With the court's permission, I would like to start with the issue of 101 and the 156 patent. As the court is aware, in the district court, the method of treatment claim was an abstract idea. On appeal, I believe the appellees are now saying that it is a law of nature. And today we have a body of case law that the district court didn't have, which should be helpful. Those cases state very strongly that you look at what the claim is directed to. The claim is directed to a method of treatment. Method of treatments are not natural. The compound that's being used is not natural. And therefore, step one of the 101 analysis should allow this claim to go forward as patent eligible. Should the court consider that we need to understand that on this case, this was decided as a motion on the pleadings without fact-finding. Should the court consider that we need to go to step two, saying the claim as a whole may be patent ineligible, but is there something inventive in it that directs you away? Is there something that's not routine or conventional? That's a question of fact that would have to go back to the district court. And that has not happened here. Moreover, the only prior art is that we have that would be considered would be the prior art of a paper patent. These are not the drug at issue, linagliptin, these type of DPP4 inhibitors did not warrant in conventional use. They weren't even approved by the FDA yet. And therefore, that issue should be resolved by the district court in the first instance. If the court doesn't have any questions on that issue, I will go to the second part. And that relates to the trial decision, which is the decision of obviousness type dual patenting and obviousness. For the purpose of my discussion, I'm going to focus on the 859 patent, because the 859 patent relates to oral tablets, method of treatment using oral tablets. And to consider this issue, I'd like the court to consider the following facts that are not in dispute. Those facts include that there are many factors that affect a dose besides the IC50 value. And that is in the appendix at 10385. There is a listing of all the factors and all the experts agreed with this. The second fact is that the IC50 value does not correlate alone to dose, cannot. The third fact is that all the experts agreed that in the reference patent, the 510 publication, the range, the 1 to 100, 1 to 1000, 1 to 4 times a day, was for 7,000 compounds and dozens of different diseases. So given that, those facts, I'd like to turn to this issue of whether there was a presumption, a presumption of obviousness from the range. I understand that you want to address the Galderma issue, but I'd rather have you move to what I think is the court's alternative finding on obviousness. That even if I agreed with you on Galderma, you still have to demonstrate that the court was wrong in finding that there was a reasonable expectation of success in using this drug at 2.5 and 5 milligrams. Apart from the presumption, because, you know, even if I agree with you on the presumption, you can still lose this case. Yes, Your Honor, I understand. That's what I'd like you to address. I'd be happy to address that. There's a fundamental disconnect in the district court decision, which relates to both fact and law. When you look at the evidence that is in the record, Dr. Grass, the expert who testified on this routine experimentation, talked about doing a dose ranging study. The district court found that dose ranging studies were routine because all the witnesses said they're subject to FDA guidelines. So the FDA says do dose ranging studies. That's fine. But what the district court did not take into account. That's fine, meaning they would do it. I'm sorry? When you say that's fine, you mean they would do it. No, I think that's what they said. Would they do it? Would they? No. Not in this instance, and for several reasons. What the district court did not credit, and this is very important, is that all the experts stated that to do the dosing study, you must first do animal studies. The O'Grady reference, and this is the state of the art reference. Dr. Grass said state of the art is the O'Grady reference, and this is appendix 1387. That reference says first you do animal studies, and then based on the animal studies, you go ahead and you evaluate what the dose ranging study should be. So you would never do a dose ranging study based on a disclosure in a patent. You might do animal testing based on that, but you would not, remember, the district court said I'm finding it routine because the FDA says you do dose ranging studies. The FDA says first you do animal testing. And here we have evidence of what happens when you do animal testing. When you do animal testing, and this is in the opinion where the district court credits what Beringer scientists actually did. There, they did the correct studies in accordance with the FDA, and from that, they found that the range was supposed to be between 50 and 200. So if one were to follow routine studies, then one must get, and the only evidence in the record on what one would get with the first dosing studies, the animal studies, which are required by the FDA, is 50 to 200. Interestingly, that range is consistent with the examples for oral tablets. Did you, I mean, there are so many issues in this briefing, and it's complex technology, so maybe I missed it. But all of this stuff that you're saying right now about these animal studies, I don't remember. Did you argue this? We did argue the whole list that's in that, the whole list, and it says including dosages in animals, yes. Where did you argue the animal studies point in your blue brief? We didn't argue it specifically, except for as part of the general point. I'm being perfectly honest with you, Ron. But when you look at this in totality. I guess, putting aside the animal studies thing, since it's not in your blue brief, and to be honest, I don't even understand what you're really saying about it, and it's not in your blue brief, which makes it hard for me to think that I ought to decide a case on that basis. I guess, for me, what it came down to was the district court found that through routine experimentation, someone would arise at this, and you're talking about dosing ranges from, say, 1 to 100 milligrams, and it seems reasonable. I didn't understand the start from the top and double down stuff. That seemed confusing to me a little bit, but what I do understand is the notion, which seems clearly articulated, that there are lots of good reasons, like side effect profiles and things, to start at the low end and then work your way up from there. And to be honest, 2.5 doesn't seem very far from 1 to me. So, I have to review this under a clear error standard, because these are all fact findings we're talking about. And there's expert testimony that says you would start at the low end for side effect reasons. And that, you know what, just makes good common sense to me, and I'm not a skilled artisan, but when I take medicine, I don't start at the highest dose, usually. So, it seems like it makes sense, and it's all in the record and supported by expert testimony. And so, I guess, under the standard of review, I really don't understand your argument about animal studies, but I don't think I'm likely to try to figure it out, since it's not in your blue brief. So, what, if anything, do you have to say to respond to what I just said? A few things. Number one, the dose range is 1 to 100, 1 to 1,000 for 7,000 compounds. And under that scenario, one would start for all 7,000 compounds at one? No, that's not the case if you're talking about double patenting, right? You have linagliptin in the 541 patent. You do, but you still need to consider the 510 reference for what it teaches. You are correct that the person would say... For double patenting purposes, once you've got the 541, the question becomes dosage, right? It does, but you still need to say, what does the 510 patent teach about dosage? And the 510 patent doesn't say, for linagliptin, start at one. The 510 patent says, I want you to look at 7,000 compounds. It's a very broad disclosure. And so then you have to say, what about the examples? Because on the 859 patent, and the court did not distinguish, on the 859 patent, the court recognized it had to consider the examples. And the examples for oral tablets are 75, 100, and 150. That's an important point because for oral tablets, 75 and 100 are within the preferred range. That 1 to 100 range, Your Honor. The examples on oral tablets, two of them are in the preferred range. The third is outside the preferred range. Therefore, for the preferred compounds, the examples are 75 and 100. The district court recognized those examples were important. And to get around them, he developed this concept of, he called it doubling in reverse. It's just dividing by two. There's no evidence in the record to support that. That doesn't really exist. So you look at that and you have to say, all right, now I have real examples. For oral tablets, it says 75 and 100. And then you need to look at unexpected results and things of that nature. And you look at the fact that when the inventors themselves did the animal testing, it was consistent with the examples. So this is a very unexpected result. Furthermore, what we need to consider is that when we consider this issue of dosing, we have no evidence that you will get to 2.5 and 5. The only evidence stated was you would get to 1, you would get to 2, you'd get to 4, you'd get to 8. There's no testimony that says then you would go backwards and look at 2.5 and then you would go backwards and look at 5 and you would do that. They did not put any evidence into the record that specifically talks about how you get to 2.5 and 5. You're into your remodel. Do you want to say that? I'm sorry?  Oh, yes. Thank you. We're just going to pause for one moment here. Thank you. I'm all set. Thank you, Your Honor. Good morning. I'm sorry. Go ahead. Good morning, Your Honor, and may it please the Court. I'll be happy to address some of the issues that my colleague on the other side ended with a little bit further down.  The obviousness type double patenting and the obviousness issues, these are really coming down to factual issues as opposed to legal error, and I'll be happy to go into them more. What's your specific factual evidence addressing your friend's last point, that the art shows dosage ranges up in the 75 and 100 milligrams and we're way down in the 2.5 to 5? So, Judge Hughes, I think two things there. One, I think it is also conflating obviousness type double patenting with obviousness. So, where are those numbers coming from? They're coming from examples in the patent that relate to numerous DPP-4 inhibitors, not linagliptin specifically. But there's nothing – is there anything in any of the linagliptin-specific patents that we can use for the obvious type double patenting analysis that talk about dosage range at all? Well, so for the – for obviousness type double patenting, we're looking at the reference claims, which are coming from the 541 patent. And the 541 patent, as Your Honor knows, specifically claims linagliptin, specifically for the treatment of type 2 diabetes mellitus. Sure, but my question was, does it actually do any of these references show dosage? So, for the 541, I believe it's a pharmaceutically effective amount. And then the 510 patent, of course – But in the specification of the 541, it talks about the 1 to 100 also. It does. Well, the specifications are the same. And I was just about to get to that, is that the 510 and the 541 actually share a specification. So, that preferred range of 1 to 100 is there. Listing linagliptin as one of the six most potent compounds, that's there as well. That disclosure is there as well. Right. I get all that. And, like I said, your friend said it starts off in these higher ranges. I just want to know, it seemed to me the district court relied on a specific factual finding that it would be obvious to start at the lower end. That is correct. And go up. What's the actual evidence supporting that factual finding? Well, I mean, there was expert testimony on both sides that even said that you would be starting from a low dose. And in a typical dose-ranging study, that's where you would start. Borger's own documents, and this is in the brief, as I'm sure the court knows, Borger's own documents talks about the potency of linagliptin and how you would start with a low dose. So, there was numerous evidence in the record as to why one would go from the low dose and go up. And I believe even Judge Moore, even from a common-sense perspective, Judge Moore commented that that is typically the case. Yeah, but you just basically told Judge Hughes in response to the question that there's a lot of evidence in the record that one would start at a low dose. And you gave none of the reasons. Why not? Why aren't you walking through the reasons? There were three reasons articulated in the trial transcript, none of which you've mentioned. I can't imagine why. Low dose is a smaller pill, makes it easier to swallow. Sure. Low dose is easier to formulate in combination pills. Low dose may result in a lower risk of drug-to-drug interaction. And number four, low dose has lower side effects. Be more precise in your argument. Give us reasons and facts and cite the record. Don't just answer his question by telling him, well, there's lots of evidence that says so. Without actually any rationale or pointing to any evidence. I understand and appreciate that, Judge Moore. And thank you for bringing up those four points. Those four points are actually testified to by one of the named inventors. And so, to Judge Moore's point, yes, even their own inventor stated that. Their own slides stated that. 30B6 testimony stated that. So, there is ample evidence in the record to suggest, or not just suggest, but actually state that you would start from the low and go to the high. Your Honors, I do want to, since my colleague also started with 101, why don't I revisit 101 and we can, of course, talk about the obviousness-type double-patenting issues here. Is there also an obviousness and obviousness-type double-patenting issue with respect to the 156 coin? Is there an obviousness and obviousness-type argument you're saying with respect to that? Well, yes, Your Honor. There might very well be. Obviously, you know, that issue isn't what's... Has that been raised in the district court? So, that specific issue wasn't raised because, remember, it was on a motion to dismiss, a 12C motion. So, the whole 12C motion was based upon the 101 issues. And so, that was granted. And so, as a result of that, that's it. That's where we are procedurally. So, if we disagree with you on 101, it has to go back. But I assume you have a 103 and obviousness double-patenting-type argument. There are certainly other arguments there, Judge Hughes. I would argue, though, that there isn't a basis for remand, and we can discuss that a bit. But to answer your question head-on, yes, there would be other arguments with respect to invalidity. But the 101 was... Obviousness and obviousness-type double-patenting, right? Correct. There would be other types of arguments. Correct. Yeah. But going back to, then, the 101, and I'm fully cognizant of how versed this panel is on those issues, Mayo and now this Court's more recent decision in INO at least make clear that, with respect to method of treatment patents, there isn't a per se rule that says method of treatment patents are patent-eligible. Now, guided by Mayo, the District Court properly concluded that the 156 patent was ineligible because it failed the two-step Mayo test insofar as the claimed advance was nothing more than a natural law, the natural law actually being the recognition that linagliptin is preferentially excreted by the liver. That's an inherent property. And with respect to the second step, the District Court also properly found that the other elements of the claim, individually or in the ordered combination, did not in any way create an inventive concept that then rescued eligibility. Well, there certainly are no black-letter rules. As I wrote recently in a dissent, we've never held a diagnostic claim eligible since Mayo. Likewise, since Vanda was decided, we've held a number of treatment claims eligible, and I've never seen us hold a method of treatment claim ineligible. So while I'm not suggesting there is a black-letter rule, why don't you start, instead of trying to tell me how this may or may not be like Mayo, tell me why it's not exactly like Vanda. Oh, sure, Your Honor. Vanda had a specific dosage regimen. It was an outlined actual dosage regimen. There had to be a genotypic identification of a particular type of marker that would indicate whether or not that subject is a metabolizer of a certain functional group. And based on that, based on that information, which arguably is a natural law, but based on that information, a specific dosage regimen was actually constructed. It's not a very specific dosing regimen, though. It's if you have this marker, give one dose. If you don't have this marker, give the other dose. But that is a specific dosage. Well, isn't this, I mean, certainly this is a little bit more general, but isn't this, similarly, if you suffer from a number of conditions and also have diabetes, use this class of drugs. Why isn't that exactly like Vanda? Well, because, well, first of all, there is no dosage here. Actually, that's not true. In Claim 10, which is one of the two claims at issue, it says, and do it at the same dose as a patient for normal renal failure. So actually it tells you exactly what dose. But there's no articulation, first of all, of what that dosage is. And to your point, though, to your question, Judge Moore, if we read that to its logical conclusion, all it's saying is keep doing what you're doing. Answer Judge Hughes' question because I did not mean to cut you off. So, Judge Hughes, if I recall your question correctly, the question is how is there not a specific dose given in the claims at issue here. There is no dose, no instruction to do anything in this particular patent. All it says is liniculous. That's not true. The plain language of the patent says it's a method of treating things, and then one of the steps is orally administering a dosage. Again, these are incredibly broad patents. I don't understand how they will stand up under any kind of obviousness analysis at all, if we affirm on the other two. But I don't see how you can read a method of administering a drug. And I agree with Judge Moore. Claim 10 actually tells you the exact dosage. It may be not the exact dosage, but the type of dosage you can do. And that's specific method of administering drugs. It's not a diagnostic patent. But, Your Honor, we have to focus on the claim to advance, though, right? No, we don't. We have to look at what the claim is directed to. You're not. You're plucking out one small part of the Mayo Alice test and say, this is the dispositive step. But the first critical step in Alice and Mayo is look at what the patent is directed to. And if the claim is directed to administration of a drug, we have almost universally held, post-Mayo and Vanda and other cases, that that's patent eligible. Every single other element in that claim, Judge Hughes, is conventional and was known. I don't care. So even if we look at it from. That's not the test under Alice. So respectfully, Your Honor. The first step is what is the claim directed to? What is the claim here directed to? Correct. You tell me. It is directed to a method of treating type 2 diabetes mellitus using linagliptin. That's ultimately the treatment regimen. Is a method of treating a condition using a drug a natural law? Is a method of treating with a drug a natural law? No, Your Honor. Well, doesn't that answer the question here? No. I mean, all pharmaceutical compositions and method of treatment claims, at some point, have to have a natural law in them, don't they? I mean, I'm an English major. I don't understand chemistry and medicine like this. But the reason the body reacts in certain ways to certain drugs with certain conditions is all based, in some sense, on natural laws. But the distinction here is it's not claiming that natural law and, you know, the whole idea. It is a method of treatment claim. It is a method of treatment claim. But the claimed advance itself, Judge Hughes, is nothing but a recognition of the fact that linagliptin gets excreted through the liver. What's your support for the notion that the claimed advance, as opposed to reading the patent as a whole, is the proper test to determine what the patent is directed to? Mayo itself says, Your Honor, that this court is charged with determining what the claimed advance is. Does it say that's what the patent is directed to? Can you cite to me any case that says the initial step one analysis at what the claim is directed to only narrows in on the advance over the prior art, not the claim as a whole? That seems to me to be a remarkable proposition. I think then you are a little bit misunderstanding what I'm saying. I am not disputing the fact that the claim ultimately is going to be looked at as a whole. But to determine patent eligibility for a claim like this, we do have to look at what the claimed advance is. Treatment of diabetes with linagliptin was conventional well-known. Which is why you have a really good obviousness case. Think about it also from a preemption perspective, and maybe that'll make the point. I know I'm running out of time. These are all questions that occur after step one, about whether it's actually directed to a natural law or not. Correct. We have to get past that step. And if we don't get past that step, because we determine it's a method of treatment claim, then whether it preempts, whether it is an advance or uses conventional techniques, none of that stuff matters if it's a method of treatment claim. But the natural law here, Your Honor, is simply the fact that linagliptin gets excreted through the liver. And that's why doctors don't need to do anything. That is literally what this claim is saying. Because linagliptin goes through the liver, someone who has a renal impairment, some type of renal problem, of course you can give it to them without worrying about what the dose will be. Because primarily drugs get excreted through two ways, the kidney and the liver. And so if this goes through the liver, then it won't matter if that patient has renal failure or renal impairment. You can give it to that person, and you don't have to worry about the dosage. But the natural law itself is that it is something that is inherent in linagliptin, which is that linagliptin inherently goes through the liver. That's the natural law. So I understand your point, and it's well taken, that you don't just parse out each individual element. But even taken together, the only advance you are talking about is the excretion through the liver. And that as a result of that, the doctor can just give the same type of dosage or do whatever it was doing before to this person with a kidney impairment. And why I even mentioned on preemption very briefly is the fact that Borender has the exact same type of patent that goes out to 2023. Now imagine that patent expires, and a doctor is administering the linagliptin. The patient walks in. The patient has some form of renal impairment. The doctor doesn't know that. That doctor has now infringed that 156 patent. No matter what. Well, possibly not. That's why several members of this panel have repeatedly told you it's possible you have obvious mistyped double patenting arguments you can make on this patent. So no, we don't need to turn 101 into a cure-all and deviate from our existing precedent because you want to suggest there might be long-term problems. Go raise other defenses. Don't limit yourself to just one. 101 is certainly not a panacea, Judge Moore, but 101 does have a separate gatekeeping function, as this court has recognized, than 102 and 103. And there can certainly be sometimes conflation of the two, but 101 is still the gatekeeper on should it even get a patent in the first place as opposed to should it be invalidated and it shouldn't be. Really? I didn't think it was should it get a patent in the first place. I guess I mistakenly thought 101 is are these claims directed to an abstract idea or a natural law? And you'd like us to say should it get a patent in the first place, and you're giving us hypos and scenarios of how awful it would be because they get to extend their patent protection because they already had patent protection. Gosh, if only there was a doctrine that could address that. I take your point, Judge Moore, but if it is directed to a natural law, then it's not eligible for a patent. And I think that was my point. And here, no matter what, the only discovery is that. The only discovery is that linagliptin goes through the liver, and that's why it does fail Step 1. And if we were to quickly move to Step 2 just for that purpose, every other step was conventional. Everything was new. So all we are left with is that. I think we're about out of time. All right. Thank you. Thank you, Your Honor. The Venemy got about two minutes. Thank you, Your Honor. I'm going to focus once more on the oral tablet claims. Counsel said, look at the evidence from BI where they found that it worked at this very low dosage. That was years later after the fact. What we have here is the district court recognized that you had to consider the examples. And that is his finding, that you have to consider them. But he then determined that you would go backwards from that, which is without any evidence in the record. What you then have to understand is that for an oral tablet, 75 and 100 is a low dose. Because the dosage range, that 1 to 100, is for oral. It is not for oral tablet. It's broader, like oral liquid. So for oral tablet, the reference is making a distinction and saying, there's a 75 dose and a 100 dose, which are in that preferred range of 1 to 100. And there is 150 outside. So if you look at the preferred compound, it's telling you for an oral tablet, it's 75 to 100. Then all the witnesses agreed that if you did IV, it would be lower. And when you look at the examples for IV, the ampule, it says 10 milligrams preferred, 30 less preferred. So when you look at the examples, when you read a reference for all it teaches, which is required, when you read a reference for all it teaches. And how do you comport? I mean, the district court gave four reasons someone would start at a low dose. And he cited portions of expert testimony. And I've got it right in front of me, where the expert says, or the question is, you know, do you recall what dose that was, 100 milligrams? And was that the first dose you tried in humans? No. You would typically start with a dose you may believe would be sub-therapeutic. And why would you do that? And he goes through and tells all the reasons you'd start at sub-therapeutic and work your way up from there. So you want us to start at the examples, but the district court said there was reasons to start at the lowest end. That's what he held as a fact-finding. And he cited this exact trial transcript where this expert said you wouldn't even start at the example. You would start sub-therapeutic below the example and work your way up from there. That's exactly the point. The BI inventors started with five as the sub-therapeutic. Not supposed to work. They then used 50, 100, et cetera, going up. These were their animal studies. And the judge did point to that. It's in his opinion that this is what BI did. And when they did the animal studies, they said 50 to 200. Then they go to the human. Now they're saying we're doing five as it's not going to work. Five's not going to work. We're doing 50. We're doing 100. We're doing 200. And unexpectedly, completely contrary to what all their research said, they got to five. Okay. I think we're about out of time. Thank you. Thank both counsel. The case is submitted.